J-A10021-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| JOHN L. PHILIPS AND GLEN A. PHILIPS | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 2583 EDA 2018 |
| NEW CINGULAR WIRELESS PCS, LLC, | : | |
| NCWPCS TOWER NEWCO, LLC, | : | |
| CCATT, LLC AND CCATT HOLDINGS, | : | |
| LLC | : | |

Appeal from the Order Entered July 25, 2018
In the Court of Common Pleas of Chester County
Civil Division at No(s):  2016-03577-CT

BEFORE:  GANTMAN, P.J.E., LAZARUS, J., and OTT, J.

MEMORANDUM BY OTT, J.:                          **FILED SEPTEMBER 24, 2019**

John L. Philips and Glen A. Philips (collectively, "the Philipses")[1] appeal

from the order entered July 25, 2018,[2] in the Chester County Court of

Common Pleas, granting summary judgment in favor of New Cingular Wireless

PCS, LLC, NCWPCS Tower Newco, LLC, CCATT, LLC and CCATT Holdings, LLC

(collectively, "New Cingular").  The underlying action arises from a contract

dispute between the parties, in which New Cingular used a portion of the

Philipses' property for cellular and wireless services.  On appeal, the Philipses

---

[1]  The record does not indicate the relationship between the two men.

[2]  Judgment was entered on August 23, 2018, to reflect the order.

raise the following issues: (1) this is not an interlocutory appeal because the court's determination regarding attorneys' fees is ancillary; (2) summary judgment was not appropriate because the facts established that New Cingular's continued operation of cellular equipment on the leased tower, following assignment of the lease to a new tenant, triggered the new tenant's obligation to share income from New Cingular with the Philipses, and there was an ambiguity with regard to the meaning of the certain terms in the lease agreement; and (3) summary judgment was improper with respect to New Cingular's claims of specific performance and attorneys' fees. *See* Philipses' Brief at i. Based on the following, we affirm.

The facts and procedural history are as follows. The Philipses own real property located at 233 Sweet Springs Road, Glenmoore, Pennsylvania. *See* Order, 7/25/2018, at unnumbered 1 n.1. On January 7, 2011, the Philipses and New Cingular, their tenant, entered into a lease agreement (the "Lease") regarding said property.

> The Lease permitted New Cingular (1) to own and operate a cellular tower on [the Philipses'] property ("Tower") and (2) to operate New Cingular wireless equipment on the Tower. New Cingular also had the ability to find additional collocators to use portions of the Tower for radio, television, microwave or wireless or other communication transmission and receiving equipment.[ Lease at § 10.1] Specifically, the Lease's "Collation Clause" at Section 10 provides:
>
> > Landlord and Tenant shall each have the right to permit additional collocators ("Collocators") to use portions of the Tower for radio, television, microwave or wireless or other communication transmission and receiving equipment... All rents and proceeds resulting from use by <u>other</u> users of the

- 2 -

Tower pursuant to this Subsection 10.1 shall be shared equally by Landlord and Tenant regardless of which party procured such other user. (Emphasis added).

The Lease further provides that

If an Affiliate (hereafter defined) of Tenant co-locates on the Tower, the rent for the Tower shall be at then prevailing market rates and Landlord and Tenant shall each be entitled to 50% of said rent... An Affiliate of the Tenant refers to any entity in control of, under the control of, or under common control with AT&T, Inc. and New Cingular Wireless PCS, LLC.

([Lease] at § 10.3).

Order, 7/25/2018, at unnumbered 1-2 n.1 (some citations omitted; emphasis in original).[3] Subsequently,

[i]n late 2013, New Cingular transferred the Lease to defendant CCATT LLC ("CCATT") as part of a larger transaction between their parent companies (AT&T Inc. and Crown Castle International Corp. ("Crown Castle"), respectively). AT&T Inc. and its subsidiaries (collectively, "AT&T") transferred over 9,000 of their cellular tower sites, including [the Philipses'] site, to Crown Castle

_____

[3] As will be discussed *infra*, "collocators" and "collation" are not defined by the court, the parties, or the Lease. Nevertheless, we briefly mention that the Pennsylvania Wireless Broadband Collocation Act defined "collocation" as:

The placement or installation of new wireless telecommunications facilities on previously approved and constructed wireless support structures, including self-supporting or guyed monopoles and towers, electrical transmission towers, water towers or any other structure not classified as a wireless support structure that can support the placement or installation of wireless telecommunications facilities if approved by the municipality. The term includes the placement, replacement or modification of accessory equipment within a previously approved equipment compound.

53 P.S. § 11702.2.

International Corp. and its subsidiaries. The corporate transactions that followed, in sum, were:

- New Cingular assigned the Lease and other listed items to Tower Newco.

- CCATT Holdings, Inc. purchased the membership interests in Tower Newco.

- Tower Newco then merged into CCATT.

- New Cingular retained its right to operate its cellular equipment on the Tower.

In March of 2014, Crown Castle advised [the Philipses] that it "or a subsidiary is now responsible for the rights and obligations under the ground [L]ease agreement with you" and that Crown Castle would be "servicing all future ground [L]ease payments due and payable on or after May 1, 2014." Thereafter, in August of 2014 the [Philipses], upon further inquiry, were advised that "currently AT&T is the only carrier operating equipment on the [T]ower."

Order, 7/25/2018, at unnumbered 2-3 n.1 (citations omitted).

On April 15, 2016, the Philipses filed their complaint for breach of contract, unjust enrichment, and eviction. In their complaint, they alleged, *inter alia*, New Cingular permitted "AT&T Mobility" and possibly others, "to use portions of the Tower for radio, television, microwave, or wireless or other communication transmission and receiving equipment without paying [the Philipses] rent in violation of [Section 10 of] the Lease Agreement." Complaint, at 4/15/2016, at 10.

New Cingular filed preliminary objections, which were overruled by the trial court on December 7, 2016.[4]  On May 4, 2018, New Cingular filed a motion for summary judgment, arguing the following:

> [During the process when the Lease was transferred from New Cingular to CCATT as part of a larger transaction between their parent companies,] a misunderstanding arose that lead [the Philipses] to believe, and to allege as the sole basis of this lawsuit, that an entity other than New Cingular has been operating cellular equipment on the Tower on [the Philipses'] property.  This is the sole basis on which [the Philipses] seek relief and it has been proven through discovery to be incorrect.
>
> …
>
> 11.  By way of background and not material to the grounds of [the Philipses'] lawsuit (*i.e.*, that an entity other than New Cingular operates on the Tower), [the Philipses'] confusion regarding the entity operating on the Tower arose when AT&T Inc. and its subsidiaries (collectively, "AT&T") decided to transfer over 9,000 of their cellular tower sites, including [the Philipses'] site, to Crown Castle International Corp. and its subsidiaries.
>
> 12.   Crown Castle International Corp. and its subsidiaries (collectively, "Crown Castle") only manage cellular towers; Crown Castle is not a cellular service provider and does not transmit or receive cellular signals.
>
> 13.  Thus, AT&T transferred the management of its cellular towers over to Crown Castle, but AT&T retained the existing rights of its subsidiaries to have equipment on those towers (hereinafter, "AT&T -Crown Transaction").
>
> 14.  In the AT&T -Crown Transaction, New Cingular's rights and obligations under the Lease were transferred to CCATT, including the Tower and the obligation to pay ground rent to [the Philipses].

---

4   New Cingular also filed an answer, new matter, and counterclaim on February 3, 2017.

15. But New Cingular retained its right to operate its cellular equipment on the Tower.

16. After the AT&T -Crown Transaction was consummated, AT&T and Crown Castle informed [the Philipses] of the Transaction and that CCATT was the new tenant under the Lease. Crown Castle also informed [the Philipses] that:

> AT&T is the only carrier operating equipment on the tower. No tower or ground space has been sublet to any third parties for collocation of equipment as a result of this transaction. AT&T remains the anchor tenant under the Lease. The payment of ground rent under Section 7 of the Lease entitles an AT&T entity to operate its equipment at Site as the anchor tenant. Consequently, no revenue share is due for AT&T's continued operation of the site.

17. Apparently, after this letter, [the Philipses] got the mistaken impression that AT&T Mobility is a separate entity with cellular equipment on the Tower.

18. The confusion may have arisen because New Cingular does business as AT&T Mobility in Pennsylvania, which is a fictitious name and not a separate corporate entity.

…

34. It is undisputed that from January 7, 2011 (the execution date of the Lease) to the present, New Cingular is the only entity operating cellular equipment on the Tower.

35. AT&T Mobility is a fictitious name for New Cingular and is not a separate entity operating any cellular equipment on the Tower.

36. Further, no third-party nor any affiliate of New Cingular or CCATT is operating any cellular equipment on Tower.

37. As a result, there [wa]s no breach of the Lease.

Defendants New Cingular Wireless PCS, LLC, NCWPCS Tower Newco, LLC, CCATT Holdings LLC and CCATT LLC's Motion for Summary Judgment, 5/4/2018, at 2-5, 8 (citations and footnote omitted). New Cingular also

claimed they were entitled to specific performance and attorneys' fees. ***Id.*** at 10-12.

The Philipses filed a response to the motion for summary judgment on June 8, 2018. They averred:

> New Cingular acknowledges that it was the tenant from January 7, 2011 until January 21, 2014. After January 21, 2014, CCATT became the tenant under the Lease. However, the discovery responses reveal that after CCATT became the tenant under the Lease (*i.e.*, after January 21, 2014), New Cingular Wireless used portions of the Tower to transmit or receive radio, television, microwave or other communications.
>
> …
>
> Thus, due to the fact that CCATT is now the tenant under the Lease, New Cingular Wireless is a collocator on the Tower because New Cingular Wireless, not CCATT, is the owner/operator of the equipment on the Tower and therefore the rents and proceeds for such use are to be shared equally by both landlord (Plaintiffs) and tenant (CCATT) pursuant to the Collocation Clause. This obligation to share rents under applies even when the collocator is an affiliate of the tenant.

Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, 6/8/2018, at 4-5 (citations and footnote omitted; italics added). Furthermore, the Philipses contend that because the meaning of "collocator" is not clearly defined in the Lease,

> the Court may want to hear testimony regarding: 1) The circumstances surrounding the execution of the Lease to resolve any ambiguity regarding the meaning of "collocator"; 2) The testimony of plaintiff, John Philips, regarding such meaning; 3) The testimony of [New Cingular's] witnesses regarding such meaning; 4) The testimony of [New Cingular's] witnesses to explain why New Cingular Wireless is defined as the "AT&T ***Collocator***" in both the Site Location Agreement and First Amendment but has taken the position that it not a "collocator"

- 7 -

for the purposes of the Lease and; 5) Whether the parties intended the Collocation Clause obligations to be triggered when the owner and operator of equipment on the Tower (*i.e.*, New Cingular Wireless) is different than the tenant (*i.e.*, CCATT) under the Lease.

*Id.* at 8-9 (emphasis in original; some italics added). Lastly, the Philipses argued New Cingular's request for specific performance should be denied and they are not entitled to attorneys' fees.

Oral argument on the summary judgment motion was held on July 18, 2018. On July 25, 2018, the court entered an order granting New Cingular's motion. The court stated:

> The parties agree that the central question before the court is whether New Cingular Wireless is a collocator under the Lease's Collocation Clause such that CCATT is obligated to share equally with [the Philipses] all rent it receives from New Cingular Wireless for its use of the Tower. [New Cingular] argue that summary judgment is appropriate because New Cingular Wireless has been the only entity operating cellular equipment on the Tower from January 7, 2011 (the execution date of the Lease) to the present. [The Philipses] argue in opposition that when the Lease assignment was effectuated, the owner of the equipment on the Tower became an entity other than the "tenant" thereby triggering the terms of the Collocation Clause which entitles [the Philipses] to half of the rent received by CCATT from New Cingular Wireless. In the alternative, [the Philipses] argue that the meaning of "collocator" is not defined clearly in the Lease, making the term ambiguous and precluding the entry of summary judgment.

Order, 7/25/2018, at unnumbered 3-4 n.1. The court then found the following: (1) the Philipses' breach of contract and eviction claims failed because New Cingular is the only entity operating cellular equipment on the tower; (2) the Philipses' unjust enrichment claim failed because there was a written contract between the parties; and (3) New Cingular was entitled to

specific performance because there was no breach of contract on their part. Additionally, the court determined that pursuant to Section 11.4.1 of the Lease, New Cingular was entitled to recover attorneys' fees for a breach of contract. The court stated it "shall determine the amount of attorneys' fees to which CCATT is entitled as a result of the prosecution of its counterclaim following submission of such fees to the court for its consideration." Order, 7/25/2018, at unnumbered 6, n.1.

The Philipses filed a *praecipe* to enter judgment, and judgment was entered on August 23, 2018, in favor of New Cingular and against the Philipses. The following day, the Philipses filed a notice of appeal.[5]

On September 28, 2018, this Court issued a rule to show cause why this appeal should not be quashed as interlocutory based on the outstanding attorneys' fees issue. The Philipses filed a response on October 8, 2018. The rule to show cause was subsequently discharged.

We will first address the issue of whether this appeal is interlocutory and therefore, not reviewable, based on the outstanding attorneys' fees issue. Philipses' Brief at 13. The Philipses state the July 25, 2018, order disposed all of its claims and awarded equitable relief to New Cingular. *Id.* at 14.

---

[5] On August 27, 2018, the trial court ordered the Philipses to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The Philipses filed a concise statement on September 17, 2018. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on October 23, 2018, which incorporated its analysis from its July 25, 2018, order.

Moreover, relying on ***Samuel-Bassett v. Kia Motors Am., Inc.***, 34 A.3d 1 (Pa. 2011), *cert. denied*, 567 U.S. 935 (2012), they allege, "The [t]rial [c]ourt's determination of the amount of attorney's fees is ancillary to the appeal from the summary judgment decision, and does not deprive [this Court] of jurisdiction over this appeal." Philipses' Brief at 14. We agree.

> Whether this Court has jurisdiction to entertain this appeal presents a threshold issue. ***Burger v. School Bd. of McGuffey School Dist.***, 592 Pa. 194, 923 A.2d 1155, 1161 (Pa. 2007). Such an issue raises a question of law; accordingly, our standard of review is *de novo*, and our scope of review is plenary. ***See Com., Dep't of Envtl. Prot. v. Cromwell Twp., Huntingdon Cty.***, 613 Pa. 1, 32 A.3d 639, 646 (Pa. 2011) ("The question whether a court has jurisdiction is *de novo*, and the scope of review is plenary.").
>
> Generally speaking, appellate courts have jurisdiction to entertain appeals from final orders entered at the trial court level. ***Commonwealth v. Scarborough***, 619 Pa. 353, 64 A.3d 602, 608 (Pa. 2013). Ordinarily, a final order disposes of all claims and of all parties. Pa.R.A.P. 341(b)(1).

***Pa. Manufacturers' Ass'n Ins. Co. v. Johnson Matthey, Inc.***, 188 A.3d 396, 398-399 (Pa. 2018).

> In ***Samuel-Bassett***, the Pennsylvania Supreme Court provided:
>
> [Pennsylvania Rule of Appellate Procedure] 1701 provides that "[e]xcept as otherwise prescribed by these rules, after an appeal is taken . . . the trial court . . . may no longer proceed further in the matter." Pa.R.A.P. 1701(a). But, after an appeal is taken, the trial court may take other action "ancillary to the appeal." Pa.R.A.P. 1701(b)(1). In Pennsylvania, the trial court's action on a petition for counsel fees has been deemed to be ancillary to the appeal from the judgment on the merits. [***Miller Elec. Co. v. DeWeese,*** 907 A.2d 1051, 1057 (Pa. 2006)]. Therefore, if the petition for counsel fees is timely filed, the trial court is empowered to act on it after an appeal was taken.

*Samuel-Bassett*, 34 A.3d at 48. Accordingly, we may proceed to address the merits of this appeal as the issue of attorneys' fees is ancillary to the matter at hand.

When considering an order disposing of a motion for summary judgment,

> [o]ur scope of review ... is plenary. [W]e apply the same standard as the trial court, reviewing all the evidence of record to determine whether there exists a genuine issue of material fact. We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered.
>
> Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of [its] cause of action. Summary judgment is proper "if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury." Pa.R.C.P. 1035.2. Thus, a record that supports summary judgment will either (1) show the material facts are undisputed or (2) contain insufficient evidence of facts to make out a *prima facie* cause of action or defense and, therefore, there is no issue to be submitted to the jury. Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions. The appellate [c]ourt may disturb the trial court's order only upon an error of law or an abuse of discretion.

*Nat'l Cas. Co. v. Kinney*, 90 A.3d 747, 752-753 (Pa. Super. 2014) (some internal citations, quotation marks, and original brackets omitted).

In the Philipses' first argument, they contend the trial court erred in granting New Cingular's motion for summary judgment because the facts

established that following "assignment of the Lease by New Cingular to CCATT, New Cingular became a 'collocator' under the Lease, and the new Tenant, CCATT, became obligated to pay additional rent to the [l]andlord, Philips, pursuant to the provision of sections 10 and 17of the Lease." Philipses' Brief at 15. They cite to Sections 10.1 and 17 of the Lease, which provide as follows:

10. Co-Locate

10.1 Landlord and Tenant shall **each have the right to permit additional collocators** ("Collocators") to use portions of the Tower for radio, television, microwave, or wireless or other communication transmission and receiving equipment (each, a "Communication Device"), provided that (i) such **proposed user's** Communications Device **will not interfere with the receipt or transmission of wireless communication signals by Tenant, Landlord, or another then current user of the Tower** and (ii) such proposed user has obtained all licenses and permits necessary for the lawful operation of the Communication Device on the Tower and (iii) all Collocators shall follow Tenant's Collocation Process prior to the installation of any Communications Device…. **All rents and proceeds resulting from use by other users** of the Tower pursuant to this Subsection 10.1 **shall be shared equally** by Landlord and Tenant regardless of which party procured such other user.

…

17. Assignment. **Tenant will have the right to assign, sell or transfer its interest under this Lease without the approval** or consent of Landlord, to Tenant's Affiliate or to any entity which acquires all or substantially all of the Tenant's assets in the market defined by the Federal Communications Commission in which the Property is located by reason of a merger, acquisition, or other business reorganization. Upon notification to Landlord of such assignment, transfer or sale, and upon the assignee's, transferee's or purchaser's assumption of Tenant's obligations hereunder, Tenant will be relieved of all future performance, liabilities and obligations under this Lease provision. Tenant shall

not have the right to sublease the Leased Premises or any portion thereof, without Landlord's consent to be rendered or withheld by it in its sole discretion. Tenant may not otherwise assign this Lease without Landlord's consent, Landlord's consent not to be unreasonably withheld, conditioned or delayed. Nothing contained herein shall be construed to negate Landlord's right to fifty percent (50%) of the rental proceeds payable in connection with a Collocation. Landlord may assign this Lease provide said assignee will assume, recognize and also become responsible to Tenant for the performance of all of the terms and conditions to be performed by such party under this Lease arising on or after the date of said assignment and thereupon Landlord will be relieved of all future performance, liabilities and obligations under this Lease.

Complaint, 4/15/2016, Exhibit A ("Lease"), at 5, 11 (emphasis added).

The Philipses state:

At lease inception[,] New Cingular was a user of the Tower as permitted by its status as "Tenant". New Cingular was not an "other user" or "collocator" as contemplated by Section 10 since its right to use the Tower flowed from its status as "Tenant".

The Trial Court's focus upon the language in section 10.1 referencing "additional collocators ("Collocators")" misreads that paragraph, and, perhaps most significantly, renders meaningless the last sentence thereof, which states that "All rents and proceeds resulting from use by other users of the Tower pursuant to this subsection 10.1 shall be shared equally by Landlord and Tenant, regardless of which party procured such other user". The term "other users" in the last sentence of Section 10.1 can only be read to mean users other than Landlord and Tenant. The Trial Court's conclusion that "the original party using the Tower – in this case, New Cingular - was already considered a "collocator" under the Lease terms" is illogical, and contrary to the plain language of Section 10.1. New Cingular could not be both "Tenant" and a "Collocator" under the terms of Section 10.1. New Cingular (the only entity operating equipment on the Tower at lease inception) was the "Tenant", only. There was no "other user" operating equipment on the Tower under these undisputed facts; the Trial Court's determination that New Cingular was "collocator" under the Lease, when it was the Tenant, is error.

Moreover, as the identity of Tenant changed with the assignment of Tenant's rights in 2014, so did the status of New Cingular (i.e., an owner of equipment being operated on the leased premises) once it was no longer Tenant, but nevertheless continued to operate property on the Tower. It became (vis-a-vis the Landlord and Tenant) an "other user" as referenced in the last sentence of Section 10.1. Upon assignment of the Lease, New Cingular was relieved of all obligations under the Lease (as "Tenant") pursuant to Section 17[.]

Philipses' Brief at 17-19 (citation omitted).

Our standard of review for these issues is as follows:

"[T]he interpretation of the terms of a contract is a question of law for which our standard of review is *de novo*, and our scope of review is plenary." *McMullen v. Kutz*, 603 Pa. 602, 985 A.2d 769, 773 (2009) (citation omitted). Furthermore, it is well established that:

[w]hen the parties have reduced their agreement to writing, the writing is to be taken to be the final expression of their intention. Where the contract evidences care in its preparation, it will be presumed that its words were employed deliberately and with intention. In determining what the parties intended by their contract, the law must look to what they clearly expressed. Courts in interpreting a contract do not assume that its language was chosen carelessly. Neither can it be assumed that the parties were ignorant of the meaning of the language employed.

*Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659, 662 (1982) (citations and quotation marks omitted).

*Andrews v. Cross Atlantic Capital Partners, Inc.*, 158 A.3d 123, 131 (Pa. Super. 2017).

Further, "[i]t is well-established that three elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant

damages." ***Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.***, 137 A.3d 1247, 1258 (Pa. 2016) (citation omitted).

As noted above, the Philipses alleged the following regarding their breach of contract claim:

> 47.   It is believed and therefore averred that since the Commencement Date of the Lease Agreement, [New Cingular Wireless, Tower Newco, CCATT Holdings, and CCATT] permitted **AT&T Mobility** (and possibly others to use portions of the Tower for radio, television, microwave, or wireless or other communication transmission and receiving equipment without paying [the Philipses] rent in violation of the Lease Agreement.
>
> 48.   At this time, it is unclear whether [New Cingular Wireless, Tower Newco, CCATT Holdings, and CCATT] permitted **other collocators** to use portions of the Tower for radio, television, microwave, or wireless or other communication transmission and receiving equipment without paying [the Philipses] rent in violation of the Lease Agreement.
>
> 49.   [New Cingular Wireless, Tower Newco, CCATT Holdings, and CCATT] breached the Lease Agreement by *inter alia*, failing to pay [the Philipses] for rent for AT&T Mobility's (and possibly others) use of the Tower.
>
> 50.   [New Cingular Wireless, Tower Newco, CCATT Holdings, and CCATT] breached *inter alia*, paragraph 10 of the Lease Agreement by permitting collocators, to use portions of the Tower without paying compensation to the [Philipses].

Complaint, 4/15/2016, at 10-11 (emphasis added).

Here, the court found the following:

> First, the breach as alleged by [the Philipses] is that [New Cingular] "breached the Lease Agreement by *inter alia*, failing to pay [the Philipses] for rent for AT&T Mobility's (and possibly others) use of the Tower." It is undisputed, however, that from January 7, 2011 (the execution date of the Lease) to the present,

- 15 -

New Cingular has been the only entity operating cellular equipment on the Tower. Further, no third-party or any affiliate of New Cingular or CCATT is operating any cellular equipment on Tower.

Second, the court is not persuaded by [the Philipses'] suggestion that following the Lease assignment, New Cingular, who has remained the operator of the cellular equipment on the tower since the inception of the Lease, became a collocator in violation of Section 10 of the Lease. The plain language of Section 10 allows the contracting to parties to permit "***additional*** collocators" to use portions of the Tower. Thus, the original party using the Tower - in this case New Cingular - was already considered a "collocator" under the Lease terms. The additional rent terms []would only be triggered by an "additional" collocator - one other than the existing collocator. Given this Lease language, the use of this same term "collocator" in the Site Location Agreement, which [the Philipses] singularly rely upon in support of their assertions that New Cingular is now an "additional collocator" pursuant to Section 10 of the Lease does not undermine [New Cingular's] position.

In sum, [New Cingular] did not breach the Lease because the only entity operating cellular equipment on the Tower has been and continues to be New Cingular. [The Philipses'] Count I - Breach of Lease Agreement and Count III - Eviction, which are both premised on this purported breach, therefore, fail as a matter of law.

Order, 7/25/2018, at unnumbered 4-5, n.1 (citations omitted; emphasis in original).

We agree with the trial court's conclusion. In their complaint, the Philipses averred that New Cingular permitted AT&T Mobility to use the tower without splitting rent payments with them, which constituted the breach. However, New Cingular established that it does business in Pennsylvania as "AT&T Mobility," a fictitious name and not a separate corporate entity. ***See*** Defendants New Cingular Wireless PCS, LLC, NCWPCS Tower Newco, LLC,

CCATT Holdings LLC and CCATT LLC's Motion for Summary Judgment, 5/4/2018, at Exhibit "B-4" (AT&T Mobility's Application for Registration of Fictitious Name, 3/29/2007). Accordingly, the Philipses' cause of action for breach of contract plainly fails as New Cingular and AT&T Mobility were one in the same.

Moreover, to extent the Philipses now argue that New Cingular is no longer a tenant and was not contemplated as a "collocator" or "other user" under the terms of the Lease because New Cingular transferred the Lease to CCATT, LLC, as a part of a larger transaction between their parents companies, AT&T Inc. and Crown Castle, respectively, we find this argument unavailing. The Philipses attempt to introduce non-salient facts with respect to the classification of New Cingular. However, the undisputed facts are: (1) the Philipses and New Cingular entered into a lease agreement; (2) New Cingular was purchased, ultimately, by CCATT who became responsible for the obligations under the Lease; and (3) throughout this entire time, New Cingular continued to be the only entity using the tower.[6] The evidence demonstrated

_____

[6] New Cingular presented evidence that Crown Castle managed cellular towers and was not a cellular service provider. **See** Defendants New Cingular Wireless PCS, LLC, NCWPCS Tower Newco, LLC, CCATT Holdings LLC and CCATT LLC's Motion for Summary Judgment, 5/4/2018, at Exhibit "A" (Affidavit of Jaime Kloin). Moreover, New Cingular demonstrated it retained its right to operate the cellular equipment on the tower at issue. **See** Defendants New Cingular Wireless PCS, LLC, NCWPCS Tower Newco, LLC, CCATT Holdings LLC and CCATT LLC's Motion for Summary Judgment, 5/4/2018, at Exhibit "A-5" ("AT&T Internal Transfers Agreement"); **see also**

there were no third-parties or other subsidiaries of CCATT using the tower. Indeed, regardless of the corporate merger and re-structuring, there remains only one entity using the tower – New Cingular. Accordingly, we conclude the trial court properly determined New Cingular was not an "other user" pursuant to the Lease, and CCATT was not obligated, following transfer of the Lease, to share rental income that it received from New Cingular with the Philipses.[7]

Next, the Philipses contend the trial court erred in granting summary judgment with respect to New Cingular's claim for specific performance based

_____

Complaint, 4/15/2016, Exhibit A ("Lease"), at 2 ("4. Use of Leased Premises. The Leased Premises are to be used solely for the operation and maintenance of wireless communication transmission and receiving equipment along with associated other electronic equipment for wireless telecommunication services.").

[7] In a related argument, the Philipses argue the use of different terms, "collocators" and "other users", in Section 10.1 of the Lease is "confusing" and "raises the question of whether the terms are synonymous, or, were intended to create different categories of users of the Tower." Philipses' Brief at 21. Additionally, they stated

> [T]he definitions, and scheme pertaining to "other users" set forth in paragraph 10, had the effect of making New Cingular a "collocator" or "other user" of the Tower, once it was no longer Tenant. The [t]rial [c]ourt's conclusion that New Cingular was an "additional collocator" at Lease commencement presumes that a "collocator" is different from an "other user".

*Id.* at 21-22. However, based on our disposition and agreement with the trial court that New Cingular was the only entity using the tower, we need not reach a determination as to whether the terms, "additional collocator" and "other user," were ambiguous.

- 18 -

on its allegation that CCATT refused to share rental income it received from

New Cingular. Philipses' Brief at 23-24. Specifically, they state:

> [New Cingular's] breach of the Lease prior to [New Cingular's] demand for a Letter of Authorization precludes summary judgment in favor of [New Cingular]. [New Cingular] requested that [the Philipses] execute the Letter of Authorization (required by Township authorities for issuance of a building permit) in September of 2016. At that time, [the Philipses] did not know who was using and/or operating equipment on the Tower despite making several attempts to obtain such information from [New Cingular]. It was later established, and it is undisputed, that when CCATT became the tenant under the Lease (*i.e.*, after the 2014 assignment), New Cingular Wireless used portions of the Tower to transmit or receive radio, television, microwave or other communications. Thus, by operation of Sections 10.1 ("Co-locate") and 13 ("Assignment") of the Lease, CCATT became obligated to share (with [the] Philips[es]) rents received from New Cingular's use of the Tower after March, 2014. CCATT has failed and refused to share the rents it receives from New Cingular, giving rise to the claims set forth in the Complaint.
>
> …
>
> [The Philipses'] obligations were excused due to Tenant's breach of the Collocation Clause and failure to share collocation rent following Lease assignment in March 2014, failure to disclose the identity of the actual tenant, and refusal to share information regarding potential collocators on the Tower until after discovery in the litigation was exchanged.

*Id.* at 23-24 (citation omitted).

We are guided by the following:

> Specific performance is an equitable remedy that permits the court "to compel performance of a contract when there exists in the contract an agreement between the parties *as to the nature of the performance.*" "Specific performance should only be granted where the facts clearly establish the [party]'s right thereto, where no adequate remedy at law exists, and where justice requires it." Further, a [party] will not be successful in an action for specific performance if the evidence is so uncertain,

- 19 -

inadequate, equivocal, ambiguous, or contradictory as to render findings or legitimate inferences therefrom mere conjecture. It also is inarguable that when performance under a contract is uncertain, the court will not write the contract for the parties.

*Lackner v. Glosser*, 892 A.2d 21, 31 (Pa. Super. 2006) (citations omitted).

Here, the trial court found:

According to [New Cingular], under the Lease, [the Philipses] are required to sign a letter of authorization allowing maintenance and repair work to be performed on the cellular tower, but have failed to honor their Lease obligations.… [The Philipses] acknowledge they are required to sign the requested letter under the terms of the Lease and admit they have failed to do so. [The Philipses] contend instead that New Cingular and/or CCATT have no rights to enforce the terms of the Lease because they are themselves in default of the Lease terms. In essence, [the Philipses] argue [New Cingular] breached first.

The court, having concluded that there has been no breach on the part of defendants, shall require Plaintiffs to sign the Letter of Authorization and undertake any other action necessary to allow the maintenance and repairs to be performed.

Order, 7/25/2018, at unnumbered 5 n. 1.

We agree with the court's conclusion. The Philipses, again, base their argument on the premise that New Cingular breached the contract after CCATT took over the Lease. Because we previously determined the trial court properly found New Cingular did not breach the contract, the Philipses' specific performance argument is without merit. New Cingular was entitled to specific performance with respect to requiring the Philipses to sign a letter of authorization allowing maintenance and repair work to be performed on the cellular tower in accordance with the Lease.

Lastly, the Philipses argue the issuance of attorneys' fees was not appropriate because there were genuine issues of material fact regarding their claim that New Cingular had breached the Lease. **See** Philipses' Brief at 23. They state, "Assuming, *arguendo*, that there was a default by [the Philipses] in failing to execute the Letter of Authorization, there is no language contained in the Default Clause that provides any party with the right to recovery of attorney's fees." **Id.** at 24. They point to Section 11.4.1 of the Lease, which provides:

11. Insurance; Indemnification: and Liability Limitation.

…

11.4. Indemnification.

11.4.1 **Landlord covenants and agrees to indemnify, defend, and hold harmless the Tenant** and its affiliates, partners, shareholders, officers, directors, agents, and employees, from and **against any and all claims**, demands, costs, **expenses (including without limitation attorneys' fees**, **court costs, and expert witness fees**), losses, liabilities; suits, and damages **resulting from or arising out of** the negligence or **willful misconduct of or breach of this Lease** by the Landlord, its affiliates, partners, shareholders, officers, directors, agents, and employees, except to the extent such claims or damages may be due to or caused by the negligence or willful misconduct of, or breach of this Lease by the Tenant, its Vendors, affiliates, partners, shareholders, officers, directors, agents, employees, and/or Tenant's Authorized Personnel.

Complaint, 4/15/2016, Exhibit A ("Lease"), at 9 (emphasis added).

The Philipses further assert:

It is submitted that this indemnification clause applies to third party claims that may affect the parties. The Default and Remedies available for breach of the Lease are expressly

- 21 -

contained at paragraph 20 of the Lease. In such paragraph, there is no express right or agreement of the parties for the recovery of attorneys' fees for a breach of the Lease. In the absence of a clear agreement between the parties in the Default Section for the recovery of attorney's fees, it was error for the Court to conclude that such fees are awardable in this matter against Landlord for default.

Philipses' Brief at 25.

As an initial matter, it merits emphasis that contrary to the Philipses' allegation, the trial court has not awarded any attorneys' fees to New Cingular. *See* also Trial Court Opinion, 10/23/2018, at unnumbered 1. As noted above, the issue was not decided in the court's order regarding the motion for summary judgment, but was to be addressed at a subsequent date. However, the Philipses filed their notice of appeal, which stayed any proceeding or further determination on the matter. Second, as the trial court correctly found:

> [The Philipses'] suggestion, that their conduct amounted to a default and not a breach and therefore relieves them of any obligation to pay attorneys' fees, ignores the plain language of the lease agreement. Under the terms of the lease agreement, a failure of landlord (i.e. [the Philipses]) to provide access to the leased premises or to perform any term for a period of 45 days "shall be deemed . . . a breach" of the lease agreement. ([Lease] Agreement, at ¶20.1). Thus, the language allowing attorneys' fee in cases of a breach by landlord is applicable. Second, the language at issue does not limit recovery of attorneys' fees to a narrow category of circumstances. The language chosen by the parties is broad and all-encompassing in identifying the [Philipses'] obligation to indemnify and hold harmless [New Cingular] against "any and all" claims arising out of the [Philipses'] breach of the contract. The parties' contractual language did not limit such claims to third-party claims as argued by [the Philipses]. Finally, the lease agreement is specific in identifying as recoverable expenses, "without limitation", attorneys' fees.

- 22 -

*Id.* at unnumbered 2.

Indeed, the Philipses misinterpret Section 20.1 of the Lease in their argument, which provided New Cingular with an express right if the Philipses defaulted on the Lease, thereby causing a breach of contract. Likewise, a review of Section 11.4.1 of the contract does not pertain only to the third parties as the Philipses suggest. Rather, it specifically provided New Cingular with the right to seek attorneys' fees if the Philipses breached the Lease. Accordingly, the Philipses' final argument also fails.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/24/19